IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| REPRODUCTIVE HEALTH SERVICES, on behalf of its patients, physicians and staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | CASE NO. 2:14-cv-1014-SRW |
| | ) | |
| LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. Introduction

Since 1973, the United States Supreme Court has consistently held that "[a] woman's decision to conceive or to bear a child is a component of her liberty that is protected by the Due Process Clause of the Fourteenth Amendment to the Constitution." Hodgson v. Minnesota, 497 U.S. 417, 434 (1990) (citations omitted); see also Roe v. Wade, 410 U.S. 113, 152–66 (1973) (a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability.). That clause, as interpreted by the Court, protects a woman's right to make such decisions independently and privately, free of unwarranted government intrusion. Hodgson, 497 U.S. at 434 (citations omitted).

Nearly forty years ago, the Supreme Court extended this liberty interest to minors in Bellotti v. Baird, 443 U.S. 622, 642 (1979) (Bellotti II), and Planned Parenthood of

<u>Central Mo. v. Danforth</u>, 428 U.S. 52, 74 (1976). The Court determined that "'the potentially severe detriment facing a pregnant woman … is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.'" <u>Hodgson</u>, 497 U.S. at 434 (citations omitted).

### A.  Parental consent and judicial bypass

For minors, however, this liberty interest has significant limits. "'[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor.'" <u>Hodgson</u>, 497 U.S. at 458 (O'Connor, J., concurring) (quoting <u>Bellotti II</u>, 443 U.S. 640-41). Thus, states are permitted to pass laws that require a minor to have the consent of her parent or legal guardian prior to having an abortion.

However, a state's requirement of parental consent cannot be absolute. To safeguard the best interests and constitutional rights of a minor who decides to terminate her pregnancy, the Court has held that, if a state elects to enact a parental consent statute, it is constitutionally obligated also to enact a judicial bypass law that affords a pregnant minor

the opportunity to obtain a court's permission to have an abortion without her parent's or legal guardian's consent. See Bellotti II, *supra*. The State of Alabama has enacted such laws; the constitutionality of certain recent amendments to Alabama's parental consent and judicial bypass statutes ("the Act") is the subject of this litigation. See Ala. Code, §§ 26-21-1, *et seq.*; H.B. 494, 2014 Leg. Sess. (Ala. 2014) (enacted; effective July 1, 2014); Ala. Code, § 26-21-4 (judicial bypass provision).

### B.  The 2014 amendments

Prior to the 2014 amendments, Alabama's judicial bypass statute allowed for an *ex parte* hearing which included as participants, in almost all instances, only the judge, the minor applicant, and her attorney. The new Act substantially alters the former bypass scheme; it is allegedly unique among all other states' judicial bypass laws. (Doc. 3 at 8).

Under Alabama's former judicial bypass law, which was enacted in 1987 and remained substantively unchanged for 27 years, the only necessary party to the bypass proceedings identified by statute was the minor petitioner. See Ala. Code 26-21-4 (2013). At his or her discretion, the presiding judge also could use a provision of the Alabama Rules of Civil procedure to appoint a *guardian ad litem* ("GAL") to represent the interests of the "infant unborn," but the judicial bypass law did not independently permit the appointment of a GAL or vest that person with the same rights as a party to the bypass proceedings. See Ala. R. Civ. P. 17(c); cf. Ala. Code § 26-21-4 (2013), Ala. Code § 26-21-4. A minor petitioner was entitled to a decision from the reviewing court within 72 hours after filing her petition, excluding Saturdays, Sundays and legal holidays, unless the petitioner requested an extension of time and the court permitted the delay. See Ala. Code

3

§ 26-21-4(e) (2013). The minor was the only person with standing to appeal the decision of the reviewing judge. Ala. Code § 26-21-4(h) (2013). "If notice of appeal [were] given, the record of appeal [was to] be completed and the appeal [was to be] perfected within five days from the filing of the notice of appeal." Id.

The 2014 Act expands the number of potential parties to a judicial bypass proceeding, and makes the inclusion of some of those parties mandatory. See Ala. Code § 26-21-4. Those additional parties are either required or permitted to "examine" the petitioner and to represent interests in addition to those of the petitioner, including the interests of the State of Alabama, the unborn child, and the minor's parent(s) or legal guardian. See id. For example, when a minor files a judicial bypass petition, the court now must immediately notify the district attorney ("DA") of the county in which the petition is filed or in which the petitioner resides, and the DA is then automatically joined as a necessary party to the bypass proceedings. Ala. Code § 26-21-4(i). The 2014 Act also allows the minor's parent(s) or legal guardian to be joined as parties if those individuals learn of the existence of the proceedings. Ala. Code § 26-21-4(l). The new law contains a statutory provision independent of Alabama Rule of Civil Procedure 17(c) which allows the reviewing court to appoint a GAL to represent "the interests of the unborn child[.]" Ala. Code § 26-21-4(j). The powers of the GAL are expansive, and that person also is joined as a party once appointed by the court. Id.

In addition, the 2014 Act codifies the rights and obligations of the DA, GAL, and the parent(s) or legal guardian in their capacities as parties. The DA and the GAL are statutorily mandated to "participate as [advocates] for the state to examine the petitioner

4

and any witnesses[.]" Ala. Code § 26-21-4(i), (j). Alabama's interests, as explained by the Act, include "protecting minors from their own immaturity" and "protect[ing] the state's public policy to protect unborn life[.]" Ala. Code § 26-21-1(d). The minor's parents, once joined as parties, have the same rights as the DA, GAL, and the minor petitioner. See Ala. Code § 26-21-4(l). All parties may be represented by an attorney, appeal the hearing judge's decision, request extensions of time, and have access to subpoena powers to compel witnesses to testify.

Moreover, the 2014 Act replaces the requirement in the former law that the hearing judge must issue a decision within 72 hours and the appeal must be "perfected" within five days. Ala. Code § 26-21-4(h) (2013). The law permits discretionary delays by the reviewing judge, either *sua sponte* or upon request by any party, "subject to the time constraints of the petitioner related to her medical condition." Ala. Code § 26-21-4(k).

### C. Parties

Plaintiff Reproductive Health Services ("RHS") is a licensed abortion facility in Montgomery, Alabama. Plaintiff June Ayers, a registered nurse, is its owner and administrator. The defendants are Luther Strange, in his official capacity as Attorney General of the State of Alabama, and Daryl D. Bailey, in his official capacity as the District Attorney for Montgomery County, Alabama (hereafter, "the DA"). (Doc. 1, ¶¶ 8-11).

### D. Motion to dismiss

This action is presently before the court on defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 30).  Defendants contend that this court lacks subject matter jurisdiction to entertain plaintiffs' claims or,

alternatively, that the court should abstain from exercising its jurisdiction. Defendants also maintain that plaintiff's allegations fail to state a claim for relief. (Docs. 30, 31). Upon consideration of the motion to dismiss, the court concludes that it is due to be denied for the reasons set forth below.

## II.  Standards of review

### A.  Rule 12(b)(1)

Another judge of this court recently summarized the appropriate standard of review for a motion brought under Rule 12(b)(1). See McCoy v. Mallinckrodt Pharm., Inc., No. 2:15CV00723-MHT-PWG, 2016 WL 1544732, at *2 (M.D. Ala. Mar. 23, 2016), *report and recommendation adopted*, No. 2:15CV723-MHT, 2016 WL 1465967 (M.D. Ala. Apr. 14, 2016) (quoting Greenwell v. University of Alabama Bd. of Trustees, 2012 WL 3637768, at *5 (N.D. Ala. 2012)). The court explained:

> Challenges to subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure can exist in two substantially different forms: facial attacks and factual attacks. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). When presented with a facial attack on the complaint, the court determines whether the complaint has sufficiently alleged subject-matter jurisdiction. Sinaltrainal, 578 F.3d at 1260. The court proceeds as if it were evaluating a Rule 12(b)(6) motion; that is, it views the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged in the complaint as true. Id.
>
> On the other hand, factual attacks question "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." Id. (citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). When a court is confronted with a factual attack, the standard of review diverges considerably:
>
> > [T]he trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1)

> motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.
>
> Lawrence, 919 F.2d at 1529 (citing Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), *cert. denied*, 454 U.S. 897 (1981)). When a district court has pending before it both a 12(b)(1) motion and a 12(b)(6) motion, the generally preferable approach, if the 12(b)(1) motion essentially challenges the existence of a federal cause of action, is for the court to find jurisdiction and then decide the 12(b)(6) motion.  Jones v. State of Ga., 725 F.2d 622, 623 (11th Cir. 1984).

Id.

This is a facial challenge under Rule 12(b)(1).  Therefore, the court considers only the pleadings in reaching a decision.

### B.  Rule 12(b)(6)[1]

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  Pielage v. McConnell, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the

---

[1] The parties merged their briefing on the motion to dismiss with briefing on plaintiffs' motion for a preliminary injunction; they also argued the merits of both motions interchangeably at a hearing held on March 28, 2015. (Doc. 31, 38). In addition, the parties have filed and referred to evidence and matters outside of the pleadings. The court has not considered matters outside of the pleadings in ruling on the defendants' motion to dismiss.  See Fed. R. Civ. P. 12(d).  Accordingly, the motion is not converted to one for summary judgment.  See id.

tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 663 (alteration in original) (citation omitted). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). While the complaint need not set out "detailed factual allegations," it must provide sufficient factual amplification "to raise a right to relief above the speculative level." Id. at 555.

"So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" Twombly, 550 U.S. 558 (quoting 5 Wright & Miller § 1216, at 233–34 (quoting, in turn, Daves v. Hawaiian Dredging Co., 114 F.Supp. 643, 645 (D. Haw. 1953)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556).

### III.  Plaintiffs' claims and defendants' motion to dismiss

The plaintiffs advance several theories of relief. They argue (1) that the Act's judicial bypass provisions violate plaintiffs' patients' rights to liberty and privacy as guaranteed by the Due Process clause of the Fourteenth Amendment by failing to provide an adequate judicial bypass to the parental consent requirement (Count I); (2) that the Act's judicial bypass provisions violate plaintiffs' patients' rights to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment by permitting adverse parties and the court to disclose deeply sensitive, private information about the minor to others, including any potential witnesses (Count II); (3) that the Act's provision limiting access to the judicial bypass to Alabama residents only violates out-of-state minors' fundamental right to interstate travel as guaranteed by the Privileges and Immunities clause by impairing the right of minors living outside of Alabama to travel to Alabama to obtain abortion services (Count III); and (4) that the Act's provision limiting access to judicial bypass to Alabama residents only violates out-of-state minors' rights to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution by treating minors differently based on their states of residence and whether they have traveled to Alabama to obtain an abortion, thereby creating classifications that penalize the exercise of the fundamental right to interstate travel (Count IV) (Doc. 1 at 13-14).

Defendants' Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to entertain these claims.  Specifically, defendants contend that plaintiffs lack standing or third party standing to bring this lawsuit.  Second, defendants argue that, should this court

find that it has subject matter jurisdiction, it nevertheless should abstain from deciding this case on its merits.  Defendants' Rule 12(b)(6) motion argues that none of plaintiffs' claims can survive as a matter of law and, therefore, the case fails on its merits.

Each of defendants' arguments is addressed in turn.

## IV.  Discussion

### A.  Justiciability

"Before Article III authorizes a court to decide a case, there must be a justiciable case or controversy. 'Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing.'" Alabama Power Co. v. U.S. Dept. of Energy, 307 F.3d 1300, 1308 (11th Cir. 2002) (citation omitted). To satisfy the requirements for Article III standing to challenge the judicial bypass statute, as amended, plaintiffs must establish that "(1) [they have] suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [statute]; and (3) a favorable judgment is likely to redress the injury." Harrell v. The Florida Bar, 608 F.3d 1241, 1253 (11th Cir. 2010). Defendants maintain that the complaint fails to demonstrate that the plaintiffs satisfy any of the three elements required for constitutional standing.[2] However,

---

[2] Defendants contend that the plaintiffs lack standing under Article III to pursue the claims now before the court because the allegations of the complaint are insufficient to demonstrate (1) an injury sufficient to confer Article III standing on RHS and Ayers (Doc. 31 at 11-17, 25-27); (2) causation, because neither the Attorney General or the District Attorney "cause the pregnant girl's asserted injury" from some of the challenged subsections of the judicial bypass provision (id. at 27); and (3) redressability, because (a) an injunction against the Attorney General or the District Attorney would not address "that injury" – i.e., "the pregnant girl's asserted injury" arising from the procedures authorized by the challenged subsections of the judicial bypass provision – and (b) because the actions permitted by the challenged subsections "can be accomplished by existing authority" independently of the judicial bypass provision (id. at 27-28).

as set forth below, the court concludes that plaintiffs have established standing as to all claims before the court.

### i. Injury in fact

To satisfy the first element of Article III standing, a plaintiff must establish that she has suffered an "injury in fact" – that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and footnote omitted). On a motion to dismiss for lack of standing, "general factual allegations of injury ... may suffice," as general allegations are presumed to "'embrace those specific facts that are necessary to support the claim,'" id. at 561 (citation omitted), and the court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."  Warth v. Seldin, 422 U.S. 490, 501 (1975).

In their complaint, plaintiffs allege, *inter alia*, that (1) Ayers "is a registered nurse, and has been the owner and Administrator of Plaintiff RHS for the past 30 years" (Doc. 1, ¶ 9); (2) RHS provides reproductive health care services, including abortion services, "to adults and minors, including minors who require a judicial bypass from the requirement of parental consent" (id., ¶ 8); (3) legal abortion is one of the safest medical procedures in the United States, and RHS's rate of complications requiring hospitalization is lower than the 0.3% overall percentage of abortion patients having such complications (id., ¶ 26); (4) Alabama law previously prohibited performing an abortion on an un-emancipated minor unless the physician or his or her agent first obtained the consent of a parent or legal

guardian of the minor, and provided a constitutionally-required judicial bypass process that mandated expressly that the court ensure that the minor's identity be kept confidential (id., ¶¶ 12, 13); (5) the 2014 Act amended the judicial bypass process in specified respects such that, in violation of minors' constitutional rights, it "no longer provides an effective, confidential, and expeditious alternative to parental consent" (id., ¶¶ 16-24); (6) because the amendments establish a process that fails to protect the minors' confidentiality, minors in need of judicial bypass may be deterred from seeking court approval, and some will resort to extreme measures, including obtaining an illegal or self-induced abortion (id., ¶¶ 30-32, 35-38); (8) RHS performs abortions only up to 14 weeks, measured from the date of the last menstrual period, and the delays to resolution of minors' petitions permitted by the Act will increase the medical risks of the procedure for them and – for some minors – push them past the point at which they can obtain an abortion (id., ¶¶ 41-42); (9) the Act provides that "[a]ny person who intentionally performs or causes to be performed an abortion in violation of the provisions of this chapter or intentionally fails to conform to any requirement of this chapter, shall be guilty of a Class A misdemeanor" (id., ¶ 25); and (10) RHS's physicians and Ayers "also face potential suspension and/or permanent revocation of their professional licenses for failure to comply with the Act" (id.).

Defendants contend that the complaint fails to identify an injury to plaintiffs RHS and June Ayers that is sufficient to sustain Article III standing. They argue that (1) neither plaintiff has alleged a direct injury or an invasion of its or her own legally protected interest; (2) plaintiffs' injury cannot rest on the statute's alleged effect on minors who may be deterred from seeking a judicial bypass, because plaintiffs' standing cannot be based on a

"'chilling effect' that result[s] from a governmental policy that does not regulate, constrain, or compel any action on their part" (Doc. 31 at 15)(citation omitted); and (3) plaintiffs' claims are "not ripe in the Article III sense because the complaint fails to identify any *imminent* injury" (id. at 16)(emphasis in original).[3] Defendants maintain that RHS and Ayers "amount only to concerned bystanders who seek to use this Court simply as a vehicle for the vindication of value interests." (Doc. 31 at 18) (internal quotation marks and citation omitted).

Defendants urge the court to "'focus on what the challenged statute seeks to regulate'" in analyzing whether plaintiffs have alleged a direct injury, suggesting that what the law seeks to regulate is only the mechanics of the judicial bypass procedure, which do not "'actually' or 'directly'" affect the defendants. (Doc. 31 at 12-13) (citations and internal quotation and alteration marks omitted). However, such an inquiry leads inescapably to the conclusion that the statute seeks to regulate abortion providers, to the extent that they provide abortions to minors.

---

[3] "The standing question bears close affinity to questions of ripeness – whether the harm asserted has matured sufficiently to warrant judicial intervention[.]" Warth, 422 U.S. at 499 n. 10. While defendants contend that the claims are not "ripe," they do so within a subsection of their brief bearing the heading, "No imminent injury" (Doc. 31 at 16, section I(A)(1)(d) of argument), which is contained within their larger argument that "RHS and June Ayers lack an Article III injury of their own" (id. at 12, section I(A)(1)). The court considers this contention as defendants have presented it – i.e., as directed to the "imminence" prong of the injury in fact inquiry. See National Organization for Marriage v. Walsh, 714 F.3d 682, 688 (2nd Cir. 2013) ("Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. ... [T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'") (citations omitted); National Treasury Employees Union v. United States, 101 F.3d 1423, 1428 (D.C. Cir. 1996) ("[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.").

The chapter of the Code of Alabama at issue, "Parental Consent to Performing Abortion Upon Minor," determines the circumstances under which a provider may perform an abortion on a minor, and makes performing such an abortion – or causing such an abortion to be performed, or intentionally failing to conform to any requirement of the chapter – a criminal offense, as well as grounds for professional discipline and civil liability.  See Ala. Code, Title 26, Chapter 21. The fact that the particular subsections of the statute claimed by plaintiffs to be unconstitutional, when read in isolation, pertain specifically to the judicial bypass process through which a minor may obtain a waiver of the parental consent requirement is insufficient to persuade this court that the Act does not "seek to regulate" those who provide abortions to minors. In the absence of parental consent or medical emergency, the judicial bypass process is a statutory prerequisite to a providers' performing an abortion on a minor lawfully, without which those who either perform an abortion on a minor or cause it to be performed are subject to criminal prosecution, civil liability, and professional discipline. The court declines to adopt the myopic view that the "challenged statute seeks to regulate" only the mechanics of the judicial bypass process itself; that process does not stand alone but, instead, is a crucial element of the Act's overall scheme regulating abortions provided to minors.[4]

---

[4] As noted above, a state may require parental consent for minors' abortions only if it also provides an expeditious alternative procedure in which the minor's anonymity is assured, and in which she is entitled to show either sufficient maturity to make the decision independently or that an abortion would be in her best interests. Bellotti II, 443 U.S. at 643-44; see also Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 899 (1992)("Our cases establish, and we reaffirm today, that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided that there is an adequate judicial bypass procedure.")(citations omitted); Planned Parenthood Association of the Atlanta Area, Inc. v. Miller, 934 F.2d 1462, 1467 (11th Cir. 1991)(noting that "[t]he Supreme Court subsequently adopted the

### a.  Plaintiff Ayers

Having determined that the statute seeks to regulate those who provide abortion to minors, the court must address whether plaintiff Ayers – a registered nurse and RHS's owner and administrator – is subject to its regulation. It concludes that she is. The criminal enforcement provision of the parental consent chapter, by its express terms, is not limited to physicians who perform abortions. This chapter states instead that "[*a*]*ny person* who performs or causes to be performed an abortion in violation of the provisions of this chapter or intentionally fails to conform to any requirement of this chapter, shall be guilty of a Class A misdemeanor." Ala. Code, § 26-21-6(a)(1) (emphasis added). Ayers alleges – immediately after she quotes this criminal enforcement language from the statute – that "Plaintiff RHS's physicians and Plaintiff Ayers *also* face potential suspension and/or permanent revocation of their professional licenses for failure to comply with the Act." (Doc. 1, ¶ 25) (emphasis added). The "also" is superfluous unless paragraph 25 is understood to allege that RHS's physicians *and* Ayers are subject to prosecution under the criminal enforcement provision quoted in the immediately preceding sentence. As the owner and administrator of a clinic that "provides abortion services to ... minors, including minors who require a judicial bypass from the requirement of parental consent" (id., ¶¶ 8, 9), Ayers clearly is in a position to facilitate or "cause[] to be performed" (Ala. Code, § 26-21-6) an abortion at RHS in violation of the Act – or  intentionally to "fail to conform to any requirement of [Chapter 21]" id. – as to a minor who requires, but fails to obtain, a

---

Bellotti II plurality opinion as controlling precedent")(citing City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416 (1983) ("Akron I"), *overruled on other grounds by* Casey).

court order through the allegedly unconstitutional judicial bypass process established by the Act.[5] Ayers' factual allegations establish the possibility that she may be held criminally liable under the Act. (See Doc. 31 at 13-14).[6]

The existence of an injury is not alone sufficient to establish standing. The plaintiffs' injury also must be "imminent." In this case, the material allegations of Ayers' complaint

---

[5] The Act also contemplates that criminal liability may be imposed on someone other than the physician, as it provides for immunity from such criminal liability to "[a] physician *or his or her agents who demonstrates compliance with the requirements of this chapter*" for the actions of a minor or other person in presenting falsified documents to satisfy the parental consent requirement. See Ala. Code, § 26-21-7 (emphasis added; error in original).

[6] Defendants contend that "it is ... plausible that an abortion clinic owner or administrator cannot violate [§ 26-21-6(a),]" in view of the provision of the Alabama Administrative Code "'making the "physician performing the procedure' 'responsible for the procedure[.]'" Id. (citing Ala. Admin. Code § 420-5-1-.03). The administrative code language on which defendants rely – which is contained within an Alabama Department of Public Health administrative code provision relating to "Patient Care" in abortion clinics – states, in pertinent part, that "[a]ll patient care must be rendered in accordance with all applicable federal, state, and local laws, these rules, and current standards of care, including all professional standards of practice. As with any surgical procedure, the physician performing the procedure is responsible for the procedure and for ensuring that adequate follow-up care is provided." Ala. Admin. Code § 420-5-1-.03(1). Read in context, the cited language does not speak to the issue of whether Ayers is subject to prosecution under § 26-21-6 of the Alabama Code, nor does it appear to offer Ayers any defense to criminal liability under that section. Indeed, the quoted administrative code provision is promulgated by the Alabama Department of Public Health's Division of Licensure and Certification, within the chapter devoted to "Abortion or Reproductive Health Centers." See Ala. Admin. Code, Ch. 420-5-1. Even assuming that this provision addresses the physician's responsibility in the context of criminal liability, it cannot be read to exclude RHS or Ayers from such liability; that very provision includes language imposing duties on the abortion facility and "agents" of the physician to comply with state law. See Ala. Admin. Code § 420-5-1-.03(2) (requiring that "[t]he *facility* ... develop and *follow* detailed written policies and procedures that are consistent with all applicable federal, state and local laws") (emphases added); id. at § 420-5-1-.03(4)(f)(8) (requiring that "[p]rior to performing an abortion on a minor, ... the physician *or his or her agents* shall obtain and complete all legally required forms for consent and attach supporting documentation") (emphasis added).

Thus, the court is unpersuaded by defendant's contention that, because defendants are "unaware of any authority conferring upon abortion providers their own right to perform abortions on minors without parental consent," plaintiffs must be seeking to vindicate only the rights of their minor patients. (Doc. 31 at 15). Ayers' allegations clearly implicate her *own* interest in being free from criminal prosecution – or the threat of prosecution – under an allegedly unconstitutional statute, while continuing to provide legal abortion services through RHS to the full extent that her minor patients' right to choose such services is protected by the U.S. Constitution.

16

permit a reasonable inference that Ayers' injury is "imminent." She alleges that she is the owner and administrator of a clinic that "provides" (in the present tense) abortions to minors who require a judicial bypass, and that the Act introduces constitutional infirmities into the process that will deter some minors – including plaintiffs' minor patients – from seeking a judicial bypass, will delay others beyond the gestational period during which RHS can perform an abortion, and will exclude non-resident minors from the judicial bypass alternative to parental consent entirely (see Doc. 1, ¶¶ 2-3, 8-9, 24, 25, 32, 35, 38, 41 (the latter three paragraphs under the section entitled, "The Effect of the Act on Plaintiffs' Patients")).  In short, construed in her favor, Ayers' complaint alleges that the clinic she owns will lose minor patients as a result of the allegedly unconstitutional provisions of the Act – patients to whom Ayers must refuse services due to the threat of criminal prosecution. Ayers' allegations suffice to demonstrate that her injury is "imminent." See Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 916-17 (9th Cir. 2004) (physician who intended "to continue to perform abortions for his patients, of whom some are minors" alleged a "sufficiently concrete and imminent injury – possible prosecution and imprisonment – to challenge the provisions that ban abortion providers from performing abortions on minors except in accord with the statutory requirements" and concluding that the plaintiff-physician's "liberty will be affected" whether he "continues to perform abortions subject to the statute, desists from performing them to avoid the statute's penalties, or violates the statute"); see also MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007) (describing the Court's standing jurisprudence as to pre-enforcement challenges to threatened government action and noting

that "[t]he plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction" because "the threat-eliminating behavior was effectively coerced" – i.e., "the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do")(citations omitted).[7]

Indeed, because the statute regulates Ayers' conduct, and would subject her to criminal prosecution for violating its provisions, Ayers is in a position not meaningfully distinguishable from that of the physician-plaintiffs who were before the Supreme Court in Danforth, 428 U.S. at 59, and Doe v. Bolton, 410 U.S. 179 (1973), and before the Eleventh Circuit in Miller, 934 F.2d at 1467. The critical factor conferring standing on the physician-plaintiffs in these cases was that the criminal enforcement provisions of the abortion statutes at issue operated directly against them. See Danforth, 428 U.S. at 59, 62; Bolton, 410 U.S.at 188[8]; and Miller, 934 F.2d at 1465 n. 2 (in which the Eleventh Circuit

_____

[7] The First Circuit reached a similar conclusion in Planned Parenthood of Northern New England v. Heed, 390 F.3d 53 (1st Cir. 2004), *judgment vacated and remanded on other grounds*, Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320 (2006), which involved a challenge to a parental notification statute that included no exception for abortions necessary to preserve the minor's health. The court discussed and rejected the contention of amici "New Hampshire Legislators" that the abortion providers lacked standing because the injury in question was speculative; the legislators had argued that it was "'not sufficient to merely show that some unknown medical conditions exist that may at some unknown future date be suffered by some unknown minors.'" Heed, 390 F.3d at 56 n. 2 (citation omitted). The First Circuit concluded that the "abortion providers themselves face an imminent injury – civil or criminal prosecution for performing an abortion in violation of the Act – sufficient to confer on them Article III standing." Id.

[8] The Georgia statutes at issue in Bolton made performing an abortion a crime, except under specified circumstances. Bolton, 410 U.S. at 182-84. The injury alleged by the nine physician-plaintiffs was that the criminal statutes "'chilled and deterred' them from practicing their ... professions[.]'" Id. at 185-86. The Court concluded that "the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes." Id. at 188. The Court reasoned:

observed, "Certainly when a physician faces criminal penalties if he violates the statute, ... he suffers sufficient threat of injury in fact to satisfy the constitutional standing requirement."). The same is true as to Ayers, and the court has before it no reason to doubt that the defendants or the State of Alabama will enforce the current parental consent law. Thus, the complaint sufficiently alleges a credible threat of prosecution as to Ayers. See Virginia v. American Booksellers Association, Inc., 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."); Georgia Latino Alliance for Human Rights v. Governor of Georgia, 691 F.3d 1250, 1257-58 (11th Cir. 2012) ("When, as here, plaintiffs file a pre-enforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement. A plaintiff may meet this standard in any of three ways: (1) the plaintiff was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application. While it is unnecessary for a plaintiff to expose

---

The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

Id. at 188.  In Danforth, the Court quoted this reasoning in concluding that "the physician-appellants clearly have standing[,]" except as to a provision of the Missouri law "pertaining to state wardship of a live-born infant." Danforth, 428 U.S. at 62 (quoting Bolton, 410 U.S. at 188); id. at 62 n. 2.

himself to actual arrest or prosecution to challenge a statute, we will not accept as plaintiffs persons having no fears of state prosecution except those that are imaginary or speculative[.]")(internal quotation marks, alteration brackets, and citations omitted).[9] Ayers alleges a realistic danger that the operation or enforcement of the statute will cause her injury; thus, she satisfies the "injury in fact" requirement for Article III standing.

### b.  Plaintiff RHS

While defendants argue that RHS, as a corporate entity, is not itself subject to prosecution under the statute (see Doc. 31 at 13), they agree that the physicians it employs

---

[9]  The physicians' allegations that the criminal statutes "chilled and deterred" their practice sufficed to establish standing in Bolton. See n. 8, *supra*. Thus, the court cannot agree with defendants that Ayers must allege that she intends to violate the parental consent law or to behave in a way that would arguably violate the law to establish that injury is "imminent." Ayers' allegation that she owns and operates a clinic that presently provides abortions for minors requiring judicial bypass orders is sufficient, since – as discussed above – the complaint sufficiently alleges that she will lose some minor patients if she complies with the law, and is subject to prosecution if she does not.

   The two abortion cases that defendants cite in support of their argument are not to the contrary. See Cleveland Surgi-Center, Inc. v. Jones, 2 F.3d 686, 687 (6th Cir. 1993)(finding no standing due to plaintiffs' failure to establish redressability, but rejecting the district court's reasoning that plaintiffs lacked standing because they had not alleged an intent to violate the statute; noting that "[t]he United States Supreme Court has held that a physician's potential for criminal liability under similar [parental involvement] laws asserted a sufficiently direct threat of personal detriment to confer standing to challenge the facial validity of the abortion laws")(emphasis in original; citations omitted); Akron Center for Reproductive Health, Inc. v. City of Akron, 651 F.2d 1198, 1200-01, 1210-11 (6th Cir. 1981)(physician who did not perform abortions after the first trimester and "had never even expressed a desire to perform a post-viability operation" lacked standing to challenge a provision relating to post-viability abortions; however, this same physician had standing to challenge a parental notification and consent provision because he "performed first trimester abortions ... and expected to continue to do so"), *affirmed in part, reversed in part*, 462 U.S. 416 (1983)("Akron I"). On appeal of the Sixth Circuit's decision in Akron, the Supreme Court concluded that "the physician plaintiff, who is subject to potential criminal liability for failure to comply with the requirements of § 1870.05(B) [prohibiting physician from performing an abortion on a minor without the consent of a parent or guardian or a judicial bypass order] has standing to raise the claims of his minor patients." Akron I, 462 U.S. at 439, 440 n. 30, *overruled on other grounds by* Casey, 505 U.S. at 881-82. While alleging an existing intent to violate a statute regulating abortion or to behave in a manner that arguably violates the statute is one way to establish an Article III "injury in fact" for purposes of a pre-enforcement challenge, Bolton, Danforth, Akron I, and Miller make clear that it is not the only way.

to perform abortions (i.e., to act as RHS's agents for purposes of providing services) may be prosecuted for violating the statute. (Id.). Thus, RHS is itself injured by the imminent threat – explained at length above – that defendants or the State of Alabama will criminally charge its employees and/or agents, who either risk prosecution by performing abortions in violation of the allegedly unconstitutional statute or are constrained to comply with it to avoid such prosecution. RHS would also suffer injury in fact from the potential suspension and/or permanent revocation of its agents' professional licenses.[10] Accordingly, RHS also satisfies the "injury in fact" requirement for Article III standing.

### ii.  Causation

To satisfy the second element of Article III standing, a plaintiff must establish that the injury is "fairly traceable to the operation of the [statute]." Harrell, 608 F.3d at 1253

---

[10] RHS not only would face possible economic injury if its agents were prosecuted or threatened with prosecution for performing abortions in violation of the Act, or lost the professional licenses necessary to conduct the business of the corporation. It also could be subject to civil liability for any criminal act of its agent – that is, the performance of an abortion prohibited by the Act – to the extent that the agent's act was undertaken in the line and scope of her employment to further the business of the employer. See, e.g., United Techs. Corp. v. Mazer, 556 F.3d 1260, 1271 (11th Cir. 2009) (employer may be held liable for the tortious or criminal acts of an employee if the acts were committed during the course of the employment to further a purpose or interest of the employer); Meyer v. Wal-Mart Stores, Inc., 813 So. 2d 832, 838 (Ala. 2001) (An employer may be liable for the intentional torts (including the criminal acts) of its agent if the agent's wrongful acts were in the line and scope of his employment or in furtherance of the business of the employer, or the employer participated in, authorized, or ratified the wrongful acts.).

However, the court notes that even if RHS did not have standing to bring this lawsuit on its own behalf, Ayers' standing alone is sufficient. The law is clear that "if the Court finds that one of the named plaintiffs has standing to pursue all of the asserted claims, it need not find that the other plaintiffs have standing for those plaintiffs to remain in the suit." Public Citizen, Inc. v. Miller, 992 F.2d 1548, 1552 (11th Cir. 1993); accord Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264 n. 9 (1977) ("Because of the presence of [one] plaintiff [with standing], we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); Miller, 934 F.2d at 1465 ("Since [the doctor] has standing, we need not consider the standing of the other parties.").

(11th Cir. 2010). Although defendants appear to contend otherwise,[11] the injury pertinent to the Article III standing inquiry is the *litigant's* injury in fact – in this case, the threat that Ayers and the agents (that is, physicians) employed by RHS will be prosecuted under the statute. See Warth, 422 U.S. at 499 ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.") (emphasis added). In the context of this pre-enforcement challenge to a legislative enactment, the causation element does not require that the defendants themselves have "caused" Ayers' and RHS's injury by their own acts or omissions in the traditional tort sense; rather, it is sufficient that the "injury is directly traceable to the passage of [the Act.]" Georgia Latino Alliance, 691 F.3d at 1260.

Plaintiffs sue the DA and the Alabama Attorney General because, *inter alia*, the former is responsible for criminal enforcement of the parental consent statute within Montgomery County – the location of plaintiffs' clinic – and the latter has statutory authority to "superintend and direct" criminal prosecutions statewide and the responsibility to instruct the DAs. (Doc. 1, ¶¶ 8-11; see Ala. Code, §§ 36-15-1(2), 36-15-14, 36-15-15, 12-17-184(2)). Defendants have the authority to enforce the parental consent law, and they do not contend otherwise. The court is satisfied that the plaintiffs' realistic danger of

---

[11] Defendants' contention that plaintiffs have not alleged facts to support causation focuses on whether the Attorney General or Montgomery County District Attorney – the defendants before the court – are the cause of injury *to the pregnant minor* and whether an injunction against them would redress the *minor's* injury. They contend that the causation problems are "perhaps most apparent" as to the provisions (1) allowing the court to appoint a GAL, call witnesses, and continue the proceedings; (2) allowing the parents to appear; and (3) allowing any GAL and the parents to appeal. (Doc. 31 at 27). Defendants notably omit from their causation argument the provisions relating to the district attorney's participation in the proceedings.

sustaining direct injury as a result of the defendants' enforcement of the Act is fairly traceable to the operation of the statute.

### iii. Redressability

The third element of standing is redressability. A plaintiff must establish that a favorable judgment is likely to redress the injury." <u>Harrell</u> at 1253 (11th Cir. 2010). Defendants contend that the claimed injury is not redressable because "many of the challenged provisions can be accomplished by existing authority." (Doc. 31 at 28). They cite the bypass court's authority under Rules 17(c) and 24 of the Alabama Rules of Civil Procedure to appoint GALs and permit intervention of interested parties, its authority pursuant to Rule 614(a) of the Alabama Rules of Evidence to call witnesses, and its inherent authority to "continue the proceedings to obtain more evidence (and possibly, even, to require DA participation)." (<u>Id.</u> at 28).

Once again, these arguments relate to the redressability of the minor patients' purported injuries from enforcement of the Act, not to the *plaintiffs'* alleged injuries. As to the latter, the court is satisfied that an order can be fashioned to declare the challenged portions of the Act unconstitutional and/or enjoin the defendants from criminal enforcement of the parental consent statute against the plaintiffs in such a way as to redress the plaintiffs' injuries, if they prevail in this lawsuit.[12]

---

[12] To the extent that defendants intend to argue that non-plaintiff minors – whose rights plaintiffs seek to assert by means of third party standing (<u>see</u> *infra*) – cannot demonstrate causation and redressability relating to their own claims against the Act, defendants' arguments also are unavailing. As to causation, plaintiffs allege an injury to their minor patients that arises from the Act's creation of a judicial bypass option that they maintain does not assure those patients that the proceeding will be expeditious and confidential. (<u>See</u> Doc. 1, ¶¶ 30-32, 35-42). They argue that the procedure established by the Act does not pass constitutional

For the reasons set forth above, the court concludes that the allegations of the complaint suffice to establish standing and support an injury in fact as to both Ayers and RHS, and also suffice to show causation and redressability. Accordingly, plaintiffs meet the constitutional requirements for standing as to all claims before the court.  See Wasden, 376 F.3d at 917 ("Weyhrich's potential punishment for violating the parental consent statute extends to all of the challenged provisions. As his complaint notes, should any aspect of the bypass provisions, including those not on their face directed toward physicians, prevent or chill a minor from seeking an abortion she would otherwise seek, she will not seek his care.").

The court also finds defendants' argument that plaintiffs lack standing under the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983 to be without merit. See Planned Parenthood Southeast, Inc. et al. v. Strange, et al., 9 F. Supp. 3d 1272, 1279 n. 4 (M.D. Ala. 2014) (rejecting defendants' arguments that these same plaintiffs lacked

---

muster, as it fails to provide these assurances *ex ante*. That injury is fairly traceable to the passage of the Act, which amended the prior judicial bypass procedure.

As to redressability, for purposes of the standing inquiry the court must assume that the judicial bypass procedure established by the Act is constitutionally deficient, as plaintiffs allege. See Warth, 422 U.S. at 499 ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal[.]"). Defendants contend – in essence – that a judgment declaring the challenged provisions to be facially unconstitutional and/or enjoining the defendants from enforcing the statute would fail to redress the injury giving rise to standing because bypass court judges might apply general rules of court procedure and evidence in an unconstitutional manner and/or exercise their inherent authority unlawfully. However, the possibility of unconstitutional conduct under other authority does not render plaintiffs' injury unredressable. As noted previously (see n. 4, *supra*), the state's ability to impose a parental consent requirement depends on the existence of a constitutionally adequate judicial bypass procedure. Assuming the substantive merit of plaintiff's claims, adequate relief in this case may include a declaration that Alabama's parental consent requirement has been rendered unconstitutional by the Alabama Legislature's creation of a judicial bypass procedure that is inadequate to support that requirement. The court cannot conclude, at this juncture, that it will be unable to fashion appropriate relief that will redress the asserted injuries to plaintiffs' minor patients if plaintiffs prevail.

standing under the Declaratory Judgment Act and § 1983) ("Strange I"); see also Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 324, 331 (2006) (doctor and clinic sued on patients' behalf under § 1983; declaratory judgments are appropriate under those circumstances). Thus, to the extent that defendants' motion to dismiss is based on lack of standing, it is due to be denied.

### B.  Prudential considerations

### i.  Third Party Standing

In addition to the constitutional requirements for standing, the Supreme Court has recognized certain rules of self-restraint justified by the prudential concern that courts should not adjudicate constitutional rights unnecessarily. One such rule is that, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, ... the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. "This rule is not absolute, however; if the party asserting the right has a close relationship with the person who actually possesses the right, and if the possessor of the right is somehow hindered in his ability to protect his own interests, then courts may grant a third party standing." In re Checking Account Overdraft Litigation, 780 F.3d 1031, 1038 (11th Cir. 2015) (citing Kowalski v. Tesmer, 543 U.S. 125, 129-30 (2004)). Defendants contend that the complaint fails to demonstrate that RHS and Ayers satisfy the requirements for third party standing and, therefore, that plaintiffs' claims for relief cannot rest on the alleged infringement of their patients' rights. Doc. 31 at 19. However, the court concludes that, under applicable precedent, the circumstances alleged in the complaint satisfy the criteria

for third party standing; thus, both RHS and Ayers may assert the constitutional rights of the clinic's minor patients in their challenge to the Act.

In <u>Bentley</u>, another judge of this court determined that these very plaintiffs – Ayers and RHS – had standing to assert the claims of their patients. The court explained as follows:

> As to [whether plaintiffs have a close relationship with their patients and whether there is an obstacle or hindrance to the patients' ability to bring the claims on their own behalf], federal courts routinely recognize an abortion provider's standing to assert the claims of its patients. <u>See</u>, <u>e.g.</u>, <u>Stenberg v. Carhart</u>, 530 U.S. 914, 120 S. Ct. 2597, 147 L.Ed.2d 743 (2000) (adjudicating challenge to abortion statute brought by abortion provider on his patients' behalf); <u>Okpalobi v. Foster</u>, 190 F.3d 337, 353 (5th Cir. 1999) (same); *vacated on other grounds on reh'g en banc*, 244 F.3d 405 (5th Cir. 2001). In <u>Singleton v. Wulff</u>, the Supreme Court recognized that the closeness of the relationship between an abortion physician and his patients is "patent."  428 U.S. at 117, 96 S.Ct. 2868 ("Aside from the woman herself … the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, th[e] decision" to have an abortion.). The court also identified two obstacles to the patients' litigation of their rights: aversion to have personal reproductive choices made public and "imminent mootness" of any one woman's claim. <u>Id.</u> These considerations are equally applicable to the case at hand. Plaintiffs assert the right of their patients to have an abortion free of undue burden; abortion providers are inextricably entwined in the exercise of this right. And while one might expect the public opprobrium leveled at women who have abortions would have softened since the Court decided <u>Singleton</u> in 1976, the plaintiffs' evidence, at this time, demonstrates that this is not the case. Accordingly, the plaintiffs' assertion of their patients' claims is proper.

951 F. Supp. 2d at 1284-85 (Thompson, J.). The following year, the court held yet again that these same plaintiffs had standing to assert the claims of their patients. <u>See</u> <u>Strange I</u>, 9 F. Supp. 3d at 1279 n. 4. It explained: "The State also argues that the plaintiff clinics have no standing to assert the rights of their patients. It is well established that abortion

doctors and clinics have standing to bring this type of suit." Id. (citing Singleton v. Wulff, 428 U.S. 106, 117 (1976)).

This court is similarly persuaded that the plaintiffs in this case have third party standing to assert the claims of their minor patients through this lawsuit. See also, e.g., Whole Woman's Health v. Hellerstedt, __ U.S. __, 136 S. Ct. 2292, 2296 (2016) (assuming without discussion that physicians and clinics had third party standing to assert patients' right to abortion); Casey, 505 U.S. at 851(same); Planned Parenthood of Cent. New Jersey v. Farmer, 220 F.3d 127, 147 (3d Cir. 2000) (determining that abortion clinic and physicians had third party standing to challenge constitutionality of state statute barring partial birth abortions, based in part on Casey); Miller, 934 F.2d at 1465 n. 2 (deciding that physician had third party standing to challenge an abortion statute on behalf of his minor patients); Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 332-4 (5th Cir. Unit B Nov. 13, 1981) (finding that individuals and medical center had standing to challenge an abortion statute on behalf of their patients).[13]

### a. Close relationship

Defendants maintain that in Miller, "the Eleventh Circuit granted a physician third-party standing" and "expressly reserved judgment on 'the standing of the other parties,' thus leaving open the standing question as to plaintiffs like RHS and June Ayers in this case." (Doc. 31 at 21-22) (citations omitted).  However, no physician was a party to the

---

[13]   Deerfield Medical Center is binding precedent in the Eleventh Circuit. See Doe v. Busbee, 684 F.2d 1375, 1378 n. 2 (11th Cir. 1982) (as Deerfield Medical Center was decided by a Unit B panel of the former Fifth Circuit, the Eleventh Circuit "'regards the decision as binding precedent ...'") (quoting Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982)).

appeal in <u>Deerfield Medical Center</u>, and the court there held that the abortion clinic owner/operators – i.e., plaintiffs holding the same relationship to potential patients as do RHS and Ayers – had third party standing to assert the constitutional rights of those patients. <u>Deerfield Medical Center</u>, 661 F.2d at 330, 330 n. 1, 334.[14] Thus, circuit precedent

---

[14] In concluding that the physician would be an effective advocate for his minor patients, the <u>Miller</u> court quoted the <u>Singleton</u> plurality's observations that "[a] woman cannot safely secure an abortion without the aid of a physician" and that the closeness of the relationship between the abortion patient and her physician is "patent." <u>Miller</u>, 934 F.2d at 1465 n. 2 (quoting <u>Singleton</u>, 428 U.S. at 117-18). The same may be said for plaintiffs like Ayers (and the individual plaintiffs in <u>Deerfield Medical Center</u>), who operate licensed medical facilities within which physicians provide abortions. See <u>Planned Parenthood Southeast, Inc. v. Bentley</u>, 951 F.Supp.2d 1280, 1285 (M.D. Ala. 2013)("Plaintiffs [abortion facility operators] assert the right of their patients to have an abortion free from any undue burden; abortion providers are inextricably entwined in the exercise of this right."); <u>see also</u> <u>Singleton</u>, 428 U.S. at 114-15 ("If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.").

Defendants criticize the *jus tertii* holding of <u>Miller</u> as "supported only by a scant analysis," as "wrongly attributing [the <u>Singleton</u> plurality opinion] to the Supreme Court," and as irreconcilable "with the Supreme Court's more recent decision in <u>Kowalski</u> requiring strict adherence to the 'hindrance' and 'close relation' criteria." (Doc. 31 at 21-22). Defendants maintain that this court is "obligated to follow <u>Kowalski</u> and reject [plaintiffs'] bid to stand in their patients' shoes." (<u>Id.</u> at 22). In <u>Kowalski</u> itself, however, the Court noted examples of circumstances in which it has applied the *jus tertii* criteria "quite forgiving[ly]":

> We have been quite forgiving with these criteria in certain circumstances. "Within the context of the First Amendment," for example, "the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." <u>Secretary of State of Md. v. Joseph H. Munson Co.,</u> [467 U.S. 947, 956 (1984)]. And "[i]n several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." <u>Warth v. Seldin</u>, *supra*, [422 U.S. ] at 510, 95 S.Ct. 2197 (emphasis added)(citing <u>Doe v. Bolton</u>, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); <u>Griswold v. Connecticut</u>, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); <u>Barrows v. Jackson</u>, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); <u>see</u> <u>Craig v. Boren</u>, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

<u>Kowalski</u>, 543 U.S. at 130 (emphasis in original). Before proceeding to its analysis of the "close relationship" and "hindrance" criteria, the <u>Kowalski</u> Court observed that none of these examples was implicated in the case before it. <u>Id.</u> The facts of the present case, in contrast, are in line with <u>Kowalski</u>'s second example of "quite forgiving" application of the two criteria. See <u>Deerfield Medical Center</u>, 661 F.2d at 333 (relying on the Supreme Court's decisions in <u>Craig</u>, <u>Barrows</u> and <u>Griswold</u> in reaching its third party standing holding).

does not limit *jus tertii* standing on behalf of patients to their physicians alone. See also Eisenstadt v. Baird, 405 U.S. 438, 445 (1972) ("As the Court's discussion of prior authority in Griswold indicates, the doctor-patient and accessory-principal relationships are not the only circumstances in which one person has been found to have standing to assert the rights of another.") (citation omitted).

Defendants further contend that RHS and Ayers do not satisfy the "close relationship" requirement "because in this case – unlike, say, in a challenge to abortion funding restrictions, Singleton v. Wulff, 428 U.S. 106 (1976) – the providers' interests diverge from those of their patients." (Doc. 31 at 20). Defendants argue that it "would be inappropriate ... to allow abortion providers to challenge [parental consent] laws on behalf of the very class the legislation seeks to protect." (Id. at 21). However, whether there is a divergence of interest depends on which interests of the plaintiffs and the minor patients are selected for comparison. While the particular interest of the minors sought to be advanced by the legislature may be relevant to the analysis (see Harris v. Evans, 20 F.3d 1118, 1123 (11th Cir. 1994)), the "close relationship" required for third party standing does not depend on plaintiffs' interests matching this interest. The third party interest of significance to the *jus tertii* relationship analysis is the third party's interest in exercising the right that the litigant seeks to assert; in a case such as this, the relationship between the litigant and the third party must be such that the challenged statute's regulation of or

29

enforcement against the litigant would affect the third party's enjoyment of its *asserted* right adversely.[15]

The fact that this is so is illustrated by the Supreme Court's *jus tertii* analysis in Craig v. Boren, 429 U.S. 190 (1976). The statutory provisions at issue in Craig prohibited the sale of 3.2% beer to males under the age of 21 and to females under the age of 18. Id. at 191-92. On the merits of the equal protection challenge before it, the Supreme Court accepted the district court's identification of the objective of the legislation; the district court had concluded that "'a major purpose of the legislature was to *promote the safety of the young persons affected and the public generally.*'" Id. at 199, 199 n. 7 (emphasis added; citation to district court's opinion omitted).  Despite the obvious divergence between the safety interest of "the young persons affected" and the vendor's interest in selling beer to this very class of people, the Supreme Court did not ask if these interests aligned in its *jus*

---

[15] The holding in Harris is not to the contrary. In that case, the Department of Corrections policy at issue prohibited 'individual employee recommendations to the Parole Board in behalf of inmates[.]'" Harris, 20 F.3d at 1120 n. 2 (citation to record omitted). The Eleventh Circuit found no "congruence of interests" between the *pro se* prisoner litigant and the prison guards whose First Amendment rights the litigant sought to assert in challenging the policy. The court considered the litigant's relationship with the third parties insufficient to support third party standing because, in part, of "the adversarial nature of the relationship between prisoners and prison guards and the differing interests of the two groups[.]" Id. at 1123-24. As to the latter point, the court acknowledged that a "primary purpose of the policy ... is to protect the prison guards from any threats, coercion, or retaliation that could result if the guards were allowed to communicate directly with the parole board with respect to individual prisoners." Id. at 1123. However, the court's analysis of the congruence of interests did not stop with the DOC's stated purpose of protecting the guards; the court noted further that "one of the primary reasons that the prison guards do not challenge the policy themselves may be, simply, that they like it." Id.; see also id. at 1123 n. 9 (noting a scholar's opinion that a court should not permit third party standing if "'it believes that third parties oppose the result sought by the litigant, or that the litigant may not adequately press for a desirable result for third parties.'") (citation omitted). Thus, the Harris court's finding of incongruent interests depends on its conclusion that, in view of the adversarial nature of their relationship with the litigant, the third parties themselves might oppose the result sought by the litigant. Here, the court has no basis for concluding that plaintiffs' relationship with minors seeking abortions is similarly adversarial in nature, or that those minors who wish to obtain abortions without parental consent would themselves oppose the result that plaintiffs pursue in this action.

*tertii* analysis. Instead, it focused on the equal protection right of the vendor's potential

male customers, 18-20 years of age, and whether *that* interest would be diluted or adversely

affected by the challenged legislation's regulation of the vendor's operations:

> As a vendor with [Article III] standing to challenge the lawfulness of §§ 241 and 245, appellant Whitener is entitled to assert those concomitant rights of third parties that would be "diluted or adversely affected" should her constitutional challenge fail and the statutes remain in force. Otherwise, the threatened imposition of governmental sanctions might deter appellant Whitener and other similarly situated vendors from selling 3.2% beer to young males, thereby ensuring that "enforcement of the challenged restriction against the (vendor) would result indirectly in the violation of third parties' rights." Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.

429 U.S. at 195 (citations omitted) (parenthetical alteration in original). Comparing the

case before it to Eisenstadt, 405 U.S. 438, the Court explained that "[d]eemed crucial to

the decision to permit *jus tertii* standing [for Baird to assert the privacy interests of third

parties] was the recognition of 'the impact of the litigation on the third-party interests.' Just

as the defeat of Baird's suit and the '(e)nforcement of the Massachusetts statute will

materially impair the ability of single persons to obtain contraceptives,' so too the failure

of Whitener to prevail in this suit and the continued enforcement of §§ 241 and 245 will

'materially impair the ability of' *males 18-20 years of age to purchase 3.2% beer despite

their classification by an overt gender-based criterion*." Craig, 429 U.S. at 196 (emphasis

added) (internal citations to Baird omitted).

In short, to satisfy the "close relationship" requirement, the litigant's interest in

redressing her own injury must be aligned with the third party right she seeks to assert,

such that the litigant is "'fully, or very nearly, as effective a proponent of the right'" as the third party.  Powers v. Ohio, 499 U.S. 400, 413 (1991)(quoting Singleton, 428 U.S. at 115); see Young Apartments, Inc. v. Town of Jupiter, 529 F.3d 1027, 1042-43 (11th Cir. 2008)(acknowledging that "the interests of this landlord and its tenants are not identical" and finding "some merit in Jupiter's warning that a landlord should not be permitted to attack a town housing ordinance on behalf of its tenants, when such ordinances are generally intended to protect the health and safety of tenants against unscrupulous landlords," but holding, nevertheless, that the litigant-landlord could assert the equal protection rights of its tenants, and finding the "close relationship" requirement satisfied because "the interests of Young Apartments and its tenants are sufficiently aligned to ensure that Young Apartments will properly frame the issues in this dispute" and "will be a zealous advocate of the legal rights at issue"). Thus, the court finds defendants' contention that Ayers has a conflict of interest with her minor patients that renders third party standing inappropriate without merit. See Bentley, 951 F. Supp. 2d at 1285 n. 3 (rejecting defendants' contention that "it is improper for the plaintiffs to litigate the substantive-due-process claims of their patients because the economic and liberty interests of the plaintiffs conflict with their patients' interests in a safe, healthy abortion," an interest that the defendants argued was advanced by the challenged staff-privileges statute, and concluding "that the test for third-party standing already protects against a 'wolves ... guard[ing] the sheep' scenario")(citation omitted).[16]

---

[16] U.S. Dept. of Labor v. Triplett, 494 U.S. 715 (1990) is another case in which the Supreme Court allowed third party standing despite a conflict between the litigant's interest and an interest of the third party that

The Supreme Court has found the "close relationship" criterion to be satisfied in cases in which "[the Court has] permitted litigants to raise third-party rights in order to prevent possible future prosecution." Powers, 499 U.S. at 411 (citing Bolton, 410 U.S. 179 (1973)). In the present case, "the relationship between the state enforced measure, the injury to the litigant and the purpose or effect of the measure naturally compels the litigant to fully and aggressively assert the constitutional claims of the third persons" (Deerfield Medical Center, 661 F.2d at 333); Ayers' interest in eliminating the threat of prosecution compels her to "aggressively assert" the rights of her minor patients to make abortion decisions without undue burden, to the full extent of that right as set forth in Bellotti. Thus, Ayers satisfies the "close relationship" prong of the third party standing inquiry.

### b. Hindrance

Defendants contend that the complaint fails to establish that plaintiffs' minor patients face a hindrance in asserting their own rights that is sufficient to support third party

---

the challenged regulation sought to protect. At issue were the attorney fee provisions of the Black Lung Benefits Act and the DOL's implementing regulations, which prohibited attorneys representing black lung claimants "from receiving a fee – whether from the employer, insurer, or [Black Lung Disability] Trust Fund, or from the claimant himself – unless approved by the appropriate agency or court" and which invalidated contractual agreements for fees. Id. at 717-18. Analyzing the merits of the constitutional challenge to the fee provisions, the Court found that "[t]he regulation of attorney's fees payable by claimants themselves is designed to protect claimants from their 'improvident contracts, in the interest not only of themselves and their families but of the public.'" Id. at 722 (citation omitted).  In defending against the imposition of discipline by his state bar for collecting a 25% fee from his clients' black lung compensation awards, pursuant to his fee agreement with them and without the required approval, the attorney-litigant before the Court sought to assert the black lung claimants' due process rights to obtain legal representation. Id. at 718, 720. Without discussing the black lung claimants' interest in being protected from improvident contracts – and focusing, again, on the third party right that the litigant sought to assert – the Court allowed him to do so. Id. at 720.  It reasoned that "[w]hen ... enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist. ... A restriction on the fees a lawyer may charge that deprives the lawyer's prospective client of a due process right to obtain legal representation falls squarely within this principle." Id. (citations omitted; emphasis added).

standing, because (1) these patients can raise objections in the judicial bypass proceedings; (2) if they prefer to litigate in federal court, they may do so using pseudonyms; (3) their claims will avoid mootness as "'capable of repetition, yet evading review'"; and (4) "there is a documented history" of minors' asserting claims on their own behalf.  (Doc. 31 at 20-21).[17]  In Miller, as noted above, the Eleventh Circuit quoted the Singleton plurality's discussion of obstacles to a woman's assertion of her own rights in the context of abortion, including the fact that "'she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity  of a court suit'"; the "'imminent mootness, at least in a technical sense, of any individual woman's claim'"; and the fact that "'these obstacles are not insurmountable'" because "'[s]uit may be brought under a pseudonym, as so frequently has been done'" and because such woman's claim is not rendered "moot" in the constitutional sense even after she is no longer pregnant. Miller, 934 F.2d at 1465 n. 2 (quoting Singleton, 428 U.S. at 117-18). The Eleventh Circuit held that the physician-litigant, in his challenge to Georgia's parental involvement statute, had standing to assert the rights of his minor patients.  In the instant case, plaintiffs aver that their minor patients wish to protect the privacy of their abortion decisions and are fearful that others, including their parents, may learn of their pregnancies and decisions; they further note the condensed time frame during which abortion remains an option for their patients.  (See Doc. 1, ¶¶ 27, 30-32, 37, 41). The court finds that the present complaint alleges a "hindrance" sufficient

---

[17] On the latter point, defendants again invoke Kowalski, maintaining that "the Kowalski Court treated even a less extensive judicial track record as defeating any claim of hindrance." (Id.) (citing Kowalski, 543 U.S. at 132). The present case, as indicated above, falls within the circumstances in which, according to the Kowalski Court, the criteria for third party standing is applied "quite forgivingly." Kowalski, 543 U.S. at 130.

to support an exception to the prudential limitation on third party standing.  See Carey, 431 U.S. at 684 n. 4 ("Indeed, the case for the [contraceptive] vendor's standing to assert the rights of potential purchasers of his product is even more compelling here than in Craig, because the rights involved fall within the sensitive issue of personal privacy.").

### ii.  Prudential ripeness

In the concluding section of their argument that plaintiffs "lack an Article III injury of their own[,]" defendants contend that plaintiffs' claims are "at least not ripe in the prudential sense that they could benefit from maturation without undue hardship to the parties." (Doc. 31 at 17).  In assessing ripeness, the court must evaluate the fitness for judicial resolution of plaintiff's claims – including whether further factual development of the issues would be beneficial – and must also determine whether delayed review would cause hardship to the parties.  Beaulieu v. City of Alabaster, 454 F.3d 1219, 1227 (11th Cir. 2006)(citations omitted).[18] Defendants' argument as to Counts I and II is, in essence, that the constitutionality of the judicial bypass provision would be better litigated with the concrete factual context provided by an "as applied" challenge, and that withholding judgment now will not burden the plaintiffs.  However, in Counts I and II, plaintiffs lodge a "facial" challenge to the statute, claiming that the provision is unconstitutional because it permits the disclosure of sensitive, private information about the minor to others and otherwise fails to provide a constitutionally adequate judicial bypass to the parental consent

---

[18] See National Treasury Employees Union, 101 F.3d at 1427-28 (explaining that "[i]t is only the prudential aspect of ripeness – where a court balances 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration' – that extends beyond standing's constitutional core") (citation omitted).

requirement. Whether the statutory judicial bypass procedure is facially valid under the standard set forth in Bellotti is exclusively a legal issue that does not require factual development. See Bellotti, 443 U.S. at 623-51 (measuring challenged provisions against Bellotti requirements); Miller, 934 F.2d at 1475-82 (using the same method of analysis).[19] Additionally, the threat of prosecution alleged by plaintiffs suffices to show, at this stage of the proceedings, that delaying resolution of the constitutionality of the statute subjects Ayers and RHS to an undue burden.

As to Counts III and IV, while defendants do not expressly exclude those counts from their prudential ripeness objection, defendants do not explain how the statute's allegedly categorical exclusion of non-resident minors from a judicial bypass option would benefit from "maturation" or factual development.[20] Indeed, as discussed *infra*, the parties appear to agree on the meaning of the statutory language at issue in Counts III and IV, and no factual development is needed to resolve the matter of pure statutory interpretation that arises from those counts.  Thus, the court will not decline to exercise its jurisdiction on "prudential ripeness" grounds.

---

[19] See also Doc. 31 at 36 (defendants' contention that "most of the complaint's 'factual allegations' are simply irrelevant" because, *inter alia*, "the Supreme Court has already held that application of the Bellotti II standards (the plaintiffs' principal claim) is an issue of 'purely statutory construction.'") (citing Planned Parenthood Ass'n. of Kansas City v. Ashcroft, 462 U.S. 476, 491 (1983) (opinion of Powell, J., in which the Chief Justice joined)).

[20] Defendants argue that the fact that plaintiffs' minor patients can raise objections in bypass proceedings "counsels dismissal on prudential ripeness grounds, as giving 'the state courts further opportunity to construe [the challenged provisions]' may 'materially alter the question to be decided." (Doc. 31 at 18) (alteration in original; citations omitted). Defendants present the same argument in urging Pullman abstention, and the court considers it in that context. See Farmer, 220 F.3d at 148 n. 11 (a "contention that the matter is not ripe for review because a federal court should not attempt to decipher a state statute without the benefit of interpretation by the state courts is better framed as an argument for abstention").

### iii. __Younger__ abstention[21]

Defendants contend that this court is required to abstain under the doctrine of __Younger v. Harris__, 401 U.S. 37 (1971), from exercising jurisdiction.  (Doc. 31 at 31-33).  In __Green v. Jefferson County Commission__, 563 F.3d 1243, 1245 (11th Cir. 2009), the Eleventh Circuit described the __Younger__ doctrine as an "extremely narrow exception[] to the federal courts' 'virtually unflagging' duty 'to adjudicate claims within their jurisdiction" (id. at 1245 (citing __New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans__, 491 U.S.  350, 359 (1989) ("__NOPSI__")); it cautioned that "a district court should not lightly shirk" its obligation to exercise its jurisdiction (id. at 1251 (citation omitted).  The court observed that the doctrine "applies most often in cases involving pending state criminal prosecutions" – such as the __Younger__ case itself – but that "[e]arly on, the Court expanded __Younger__ abstention to apply to pending civil proceedings that are 'akin to a criminal prosecution' ... and, more recently, in strictly civil proceedings which implicate state courts' 'important interests in administering certain aspects of their judicial systems.'"  Id. at 1250-51(citations omitted).

In their initial brief, defendants argue that this court must abstain from exercising its jurisdiction because __Younger__ abstention is required "when (1) the requested relief will interfere with pending state-court proceedings; (2) the federal-court proceedings implicate important state interests; and (3) state proceedings provide an adequate opportunity for raising the federal constitutional claims[.]" (Doc. 31 at 31; id. at 31-33) (citing __31 Foster__

---

[21] "The question of abstention, of course, is entirely separate from the question of granting declaratory or injunctive relief."  __Lake Carriers' Association v. MacMullan__, 406 U.S. 498, 509 n. 13 (1972).

Children v. Bush, 329 F.3d 1255, 1274-75 (11th Cir. 2003) (citing Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 432 (1982)). As plaintiffs note, the Supreme Court recently has made it clear that the threshold question is whether the state court proceeding at issue is within one of the three "'exceptional circumstances' identified in NOPSI" and, if not, that the Younger doctrine does not apply. Sprint Communications, Inc. v. Jacobs, __ U.S. __, 134 S. Ct. 584, 593-94 (2013) ("[T]o guide other federal courts, we today clarify and affirm that Younger extends to the three 'exceptional circumstances' identified in NOPSI, but no further.")  Unless the state court proceedings at issue are within the three types of cases identified in NOPSI, the three Middlesex County factors argued by the defendants are irrelevant.  Id.; Dandar v. Church of Scientology Flag Service Org., Inc., 551 F. App'x. 965, 966-67 (11th Cir. 2013) ("[T]he Supreme Court clarified that these three factors are 'not dispositive' they [are], instead, *additional* factors appropriately considered by the federal court before invoking Younger,' which itself sets forth only three limited circumstances in which abstention is appropriate. If a district court in its discretion decides that none of these circumstances is present, Younger abstention is inappropriate regardless of what the Middlesex County factors indicate.") (citing and quoting Sprint Communications, 134 S.Ct. at 593); see also NOPSI, 491 U.S. at 367-68 ("NOPSI's challenge must stand or fall upon the answer to the question whether the Louisiana court action is the type of proceeding to which Younger applies."). Thus, the court must first determine whether the state court proceedings at issue are: (1) "ongoing state criminal prosecutions"; (2) "certain 'civil enforcement proceedings'"; or (3) "pending 'civil proceedings involving certain orders ... uniquely in furtherance of the state

courts' ability to perform their judicial functions.'" Sprint Communications, 134 S. Ct. at 591 (citing NOPSI, 491 U.S. at 368).

In their reply, defendants maintain that Younger applies to judicial bypass proceedings because these are civil proceedings "to enforce Alabama's parental consent policy against those minors for whom it may constitutionally do so," they operate in aid of Alabama's criminal parental consent statute, and they "seek to 'protect the very interests which underlie [Alabama's] criminal laws and to obtain compliance with precisely the standards which are embodied in [Alabama's] criminal laws.'" (Doc. 39, at 15-16) (alterations in original) (quoting NOPSI, 491 U.S. at 591, and Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975)). Defendants contend that bypass actions "bear numerous characteristics of a 'civil enforcement proceeding' for Younger purposes"; specifically, (1) "[t]hey effectively are initiated by the State in its sovereign capacity as presumably no abortion-seeking minor is a voluntary participant"; (2) "[t]hey involve, and amount to, investigations of the minor"; and (3) "a state actor is routinely party to the state proceeding." Id. at 16 (internal quotation marks and alteration brackets omitted) (citing Sprint, 134 S.Ct. at 591, 592).

The court cannot agree that a judicial bypass proceeding is a civil enforcement proceeding that is "'akin to a criminal prosecution' in 'important respects'" so as to implicate Younger. Sprint, 134 S.Ct. at 592 (quoting Huffman, 420 U.S. at 604). In Sprint, the Supreme Court explained:

> Our decisions applying Younger to instances of civil enforcement have generally concerned state proceedings "akin to a criminal prosecution" in "important respects." Such

> enforcement actions are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act.  In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges.

Sprint, 134 S.Ct. at 592 (citations with parenthetical summaries omitted). Contrary to defendants' argument, a judicial bypass proceeding is neither actually nor "effectively" initiated by the State of Alabama, nor is its purpose to "enforce" the parental consent requirement.  According to the statute, the proceeding is initiated by a petition filed by a minor who seeks a *waiver* of the parental consent requirement.  See Ala. Code, § 26-21-4(a) (providing that "[a] minor ... may petition" the court "for a waiver of the consent requirement").  The statute's requirement that the DA participate in judicial bypass proceedings does not render those proceedings "'akin to a criminal prosecution'" for purposes of a Younger analysis, even if – as defendants maintain – judicial bypass proceedings amount to "investigations" of the petitioning minors.

### iv.  **Pullman** Abstention/Certification

Defendants contend that, if this court does not dismiss this action, it should abstain on Pullman grounds and/or certify relevant questions to the Alabama Supreme Court. (Doc. 31 at 33) (quoting Siegel v. LePore, 234 F.3d 1163, 1174 (11th Cir. 2000)).

> Under the Pullman abstention doctrine, a federal court will defer to "state court resolution of underlying issues of state law." Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965). Two elements must be met for Pullman abstention to apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented. See id. at 534, 85 S.Ct. at

> 1182. ... Because abstention is discretionary, it is only appropriate when the question of state law can be fairly interpreted to avoid adjudication of the constitutional question. <u>See id.</u> at 535, 85 S.Ct. at 1182.

<u>Siegel</u>, 234 F.3d at 1174. "If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction." <u>Harman</u>, 380 U.S. at 534-35. "Absent ambiguity, [<u>Pullman</u>] abstention lacks utility and thus is improper." <u>Scheinberg v. Smith</u>, 659 F.2d 476, 480 (5th Cir. Unit B 1981) (declining to abstain because the Florida judicial bypass statute before the court was not ambiguous and, even if it were, the "ambiguity would be insufficient to trigger abstention" because under either of the two possible constructions, the statute "vest[ed] the Florida courts with constitutionally impermissible discretion to ignore a minor's maturity in determining whether to authorize her abortion"); <u>see also id.</u> at 481 ("Uncertainty is a prerequisite to certifying a question of law to a state's highest court, just as it is a prerequisite to invocation of the <u>Pullman</u> doctrine.") (declining to certify the question for interpretation by the Florida Supreme Court).

Defendants pose, by way of example, four questions which they contend are appropriate for certification because the state court's answers could reveal that the plaintiffs lack standing to challenge the Act,[22] and five others which they maintain would

---

[22] These questions are:

    (1) Can an abortion clinic or its administrator "perform[] or cause[] to be performed" an abortion within the meaning of Ala. Code § 26-21-6(a)(1)?

elicit answers from the state court that "would materially alter the complexion of the constitutional issues before the court."[23]  Id., pp. 34-35.  However, none of the questions identified by the defendants meets the requirements for Pullman abstention or certification to the Alabama Supreme Court. Defendants' proposed questions regarding whether the

---

(2) Do Alabama courts conducting bypass proceedings have the power – either under Ala. R. Evid. 614(a) or their inherent power – to call witnesses absent the authority conferred in Ala. Code § 26-21-4(f) & (k)?

(3) Do Alabama courts conducting bypass proceedings have the power – either under Ala. R. Civ. P. 17(c) or their inherent power – to appoint a GAL for the unborn child absent the authority conferred in Ala. Code § 26-21-4(j)?

(4) Do Alabama courts conducting bypass proceedings have the power – either under Ala. R. Civ. P. 24 or their inherent power – to allow the intervention of a petitioner's parents who have "otherwise" learned of the existence of the proceedings?

(Doc. 31 at 34).

[23]  The questions in this latter group are:

(5) Under Ala. Code § 26-21-4(e), (f), & (k), must the district attorney (or his or her representative), any GAL, or the minor's parents, secure court permission before issuing a subpoena to, or otherwise calling, their own witnesses to testify?

(6) Do the "unless justice requires" clauses of Ala. Code § 26-21-4(k) dictate any precise, maximum period for the court to rule on a minor's bypass petition?  If not, do Alabama courts possess authority to answer this question by court rule or order (including under Ala. Code § 26-21-4(n))?

(7) Assuming there is a precise, maximum period for ruling on the petition, would a failure to rule within that period constitute a constructive grant or denial of the petition?  Do the Alabama courts possess authority to answer this question by court rule or order (including under Ala. Code § 26-21-4(n))?

(8) Do the confidentiality provisions of Ala. Code §§ 26-21-4(o) and 8(a) prevent the district attorney from prosecuting criminal offenses based on information learned by the district attorney in the course of participating in a bypass proceeding?

(9) Alabama's Parental Consent Law currently provides that "[t]he requirements and procedures under this chapter shall apply and are available only to minors who are residents of this state." Ala. Code § 26-24-4(a).  Are minors who are not residents of this State required to comply with the parental consent requirement at all?

(Doc. 31 at 34-35).

bypass court has the power under state law – independently of the challenged statute's specific grant of such authority – to call witnesses, to appoint a GAL for the unborn child, and to allow intervention of the minor's parents are not dispositive of, or even material to, the federal constitutional questions before the court.  The constitutionality of the challenged provisions specifically authorizing such judicial acts does not depend in any way on whether those acts are otherwise allowed or prohibited as a matter of state law.  And, as noted previously, the existence of alternate state law sources of judicial authority does not preclude redress of plaintiffs' injuries through a favorable judgment on their challenges to the Act if they prevail. The remainder of the questions suggested by defendants, relating to construction of the challenged statute itself, are also either irrelevant to the claims presented in the complaint – i.e., their resolution by the state court would not moot the constitutional issues presented by plaintiff's claims or alter them materially – and/or they pertain to statutory provisions that are unambiguous. Only one of these questions – whether the statute is ambiguous regarding the applicability of certain provisions to non-resident minors – warrants discussion.

Plaintiffs allege that the Act "restricts the bypass process" to minors who are Alabama residents and, in Counts III and IV of their complaint, claim that non-resident minors' exclusion from the judicial bypass process violates those minors' rights to equal protection and their rights under the Privileges and Immunities clause. (Complaint, ¶ 24 and Counts III and IV).  Defendants contend that "the problem with both of these counts is that the Act does not say what RHS contends it says. The Act instead appears to exempt

out-of-state minors from the parental-consent requirement altogether." (Doc. 31 at 68).

Defendants argue:

> The statutory language at issue says this: "The requirements and procedures under this chapter shall apply and are available only to minors who are residents of this state." Ala. Code § 26-21-4(a) (emphasis added).  As RHS notes in its preliminary-injunction brief, "[t]he chapter in question consists of the entire parental consent statute, and so the quoted language arguably means that the entirety of the parental consent law – including [the] parental consent requirement itself – does not apply to non-residents." Doc. 3 at 5 n. 1.

(Doc. 31 at 68). Plaintiffs counter that "the placement of this language within section 4 of Chapter 21, '[p]rocedure for waiver of consent requirement,' suggests that this language is meant to apply only to the judicial bypass process." (Doc. 3 at 5 n. 1). Ultimately, defendants contend that this court should (1) construe the statutory language as a complete exemption for out-of-state minors from the parental consent requirement; or (2) in the alternative, abstain or seek interpretation of the statutory language by the Alabama Supreme Court. (Doc. 31 at 69; id. at 35, question 9; see also Doc. 45 at 3 ("The defendants reiterate ... that the proper course is for this court to dismiss counts 3 and 4 of the complaint under Rule 12(b)(6) – either because the language of Ala. Code § 26-21-4(a) unambiguously does not violate out-of-state minors' rights or under the ... [rule] ... that every reasonable construction must be resorted to in order to save a statute from unconstitutionality.") (citations and internal quotation marks omitted)). The court now considers whether this portion of the statute is ambiguous under the Pullman doctrine.

The Alabama legislature has specified how references within the Alabama Code to the Code's own internal organization are to be construed. The Code provides that, "[u]nless

otherwise indicated in the context, references in this code to titles, subtitles, *chapters*, articles, divisions, subdivisions or sections *shall mean* titles, chapters, articles, divisions, subdivisions or sections of this code." Ala. Code, § 1-1-15(a)(emphases added). Thus, under Alabama law, "chapter" means "chapter," unless the context indicates otherwise. To determine whether the context of the statute before the court should be construed to depart from the general rule regarding internal references, the court turns to the language of the statute as a whole and to Alabama's rules of statutory construction. In the case of <u>State Superintendent of Education v. Alabama Education Association</u>, 144 So. 3d 265 (Ala. 2013), the Alabama Supreme Court reiterated Alabama's "well settled rules of statutory construction" as follows:

> It is this Court's responsibility to give effect to the legislative intent whenever that intent is manifested. When interpreting a statute, this Court must read the statute as a whole because statutory language depends on context; we will presume that the Legislature knew the meaning of the words it used when it enacted the statute. Additionally, when a term is not defined in a statute, the commonly accepted definition of the term should be applied. Furthermore, we must give the words in a statute their plain, ordinary, and commonly understood meaning, and where plain language is used we must interpret it to mean exactly what it says. In addition, there is a presumption that every word, sentence, or provision of a statute was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.

<u>Id.</u> at 272-73 (citations and internal quotation and alteration marks omitted).

The Act's non-resident minor exclusion is undeniably contained within the "Petition for waiver of consent" section of the statute. (<u>See</u> § 26-21-4(a)). However, the Legislature's placement of the exclusion within that section is not evidence that the exclusion applies

only to the procedure outlined in that section (i.e., the judicial bypass alternative to parental consent) rather than to the chapter as a whole, especially given the Legislature's explicit use of the word "chapter." Again, the statute states, "The requirements and procedures under this *chapter* shall apply and are available only to minors who are residents of this state." Ala. Code, § 26-21-4(a) (emphasis added). Plaintiffs' suggestion that the Act excludes non-resident minors *only* from the judicial bypass alternative to parental consent cannot be squared with this statutory language.[24]

The court could not adopt plaintiffs' proposed construction of the non-resident minor exclusion without ignoring both the legislative pronouncement regarding construction of the Code's internal references (Ala. Code, § 1-1-15(a)) and Alabama's well-settled rules of statutory construction. The fact that one reasonably might surmise from matters external to the statute itself that the Legislature perhaps *meant* to refer to "this section" and to portions of the previous section when it used the phrase "this chapter" does not render the plain language of the statute ambiguous. The court must presume that the legislature knew the meaning of the words that it used in enacting the statute. Absent ambiguity, neither <u>Pullman</u> abstention nor certification to the Alabama Supreme Court is appropriate.

---

[24] Indeed, the court would have to conclude that the phrase "this chapter" as used in section 26-21-4(a)(1) does not mean "this chapter" – *i.e.*, Chapter 21, the parental consent chapter of the Alabama code, within which section 26-21-4 is found – and (2) instead refers, in addition to section 26-21-4 itself, to subsection (d) of section 26-21-3 (which grants minors the option to petition for a waiver of the parental consent requirement) *but not* to subsection (a) of that very same section (which imposes the parental consent requirement).

### v. Eleventh Amendment immunity

Defendants contend that the present lawsuit is barred by the state's Eleventh Amendment immunity. They point out that "the Ex parte Young exception [to Eleventh Amendment immunity] does not apply 'where no defendant has any connection to the enforcement of the challenged law at issue[,]'" and that the only defendants before the court are the Attorney General and the Montgomery County District Attorney. They maintain that, accordingly, the Eleventh Amendment bars this lawsuit except as to the challenged provision requiring DA participation in a bypass proceeding.  (Doc. 31 at 29) (citation omitted).

The court cannot agree. In view of RHS's location within Montgomery County, the criminal enforcement provision of the parental consent statute, and the prosecutorial authority of the defendants within their respective jurisdictions, the defendants have the requisite connection to enforcement of the challenged law. Thus, defendants have failed to establish that the Eleventh Amendment bars plaintiffs' claims for prospective relief against them. Summit Medical Associates, P.C. v. Pryor, 180 F.3d 1326, 1336-41 (11th Cir. 1999) (concluding that the Eleventh Amendment barred abortions providers' challenge to the private civil enforcement provision of statute regulating abortion, but not their challenge to the statute's criminal liability provision, in abortion providers' lawsuit against the Alabama Attorney General, Governor, and the Montgomery County DA); id. at 1341 ("[U]nless the state officer has some responsibility to enforce the statute or provision at issue, the 'fiction' of Ex parte Young cannot operate.").

## C.  Rule 12(b)(6) motion to dismiss for failure to state a claim

"Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality." Ashcroft, 462 U.S. at 493.  Because this case is before the court on a Rule 12(b)(6) motion to dismiss and the plaintiffs allege that the Act places unconstitutional barriers in a pregnant minor's path to an abortion through a judicial bypass, the defendants bear the burden to establish the Act's constitutionality. See Hodgson, 497 U.S. at 436 (ruling on the constitutionality of a Minnesota parental consent law). "Under any analysis, the [Alabama] statute cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests." Id. (citations omitted).

As discussed *supra*, the plaintiffs assert a facial challenge to the Act. In light of the parties' arguments on the instant motion, it is necessary to clarify the standard that this court will apply in considering plaintiffs' claims, both with regard to the motion to dismiss and throughout this litigation. The defendants presuppose that, in evaluating a facial attack on an abortion statute, the court is obligated to follow the "no set of circumstances" test of United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). However, the "no set of circumstances" analysis is not applicable to abortion cases decided after Casey, which held that an abortion law is facially unconstitutional if it places an "undue burden" in the path of a "large fraction" of the women the law affects. Casey, 505 U.S. at 895. In the intervening years since Casey, the Salerno test has been rejected as the proper standard for a facial challenge to an abortion statute by nearly every court to

consider the question.  As another judge of this court recently observed, with the exception of the Fifth Circuit, "[s]ince Casey, seven courts of appeals have found that, in a facial challenge to an abortion restriction, the appropriate test is whether the restriction acts as an undue burden on a woman's ability to obtain an abortion in a 'large fraction of the cases in which [the act] is relevant'; if so, the restriction is facially invalid." Planned Parenthood Southeast, Inc. v. Strange, __ F. Supp. 3d __, 2016 WL 1167725, at *7 (M.D. Ala. Mar. 25, 2016), *judgment entered*, 2016 WL 1178658 (M.D. Ala. Mar. 25, 2016) ("Strange II") (quoting Casey, *supra*, and citing Planned Parenthood Ariz., Inc. v. Humble, 753 F.3d 905, 914 (9th Cir. 2014); Planned Parenthood Sw. Ohio Region v. DeWine, 696 F.3d 490, 509–10 (6th Cir. 2012); Planned Parenthood Minn. v. Rounds, 653 F.3d 662, 669 (8th Cir. 2011), *vacated in part on other grounds on reh'g en banc*, 662 F.3d 1072 (8th Cir. 2011); Zbaraz v. Madigan, 572 F.3d 370, 381 (7th Cir. 2009); Heed, 390 F.3d at 58, *vacated on other grounds sub nom.* Ayotte, 546 U.S. 320; Farmer, 220 F.3d at 142–43 (3d Cir. 2000); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir. 1996)) (bracketed text in original); *Cf.* Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 748 F.3d 853, 588-89 (5th Cir. 2014) (applying Salerno). See also Cincinnati Women's Servs., Inc. v. Taft, 468 F.3d 361, 368 (6th Cir. 2006) ("[I]n considering facial challenges to abortion restrictions, every circuit, with one exception, has applied Casey's test rather than Salerno's more restrictive 'no set of circumstances' test."); Isaacson v. Horne, 716 F.3d 1213, 1230 (9th Cir. 2013) (The "no set of circumstances" standard "enunciated in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) … is applicable *except* in First Amendment and abortion cases[.]") (italics in original).

The Supreme Court's recent application of the "undue burden" and "substantial fraction" analysis of <u>Casey</u> in deciding a facial challenge to Texas abortion statutes in <u>Hellerstedt</u> confirms that the <u>Casey</u> standard is applicable here.[25]  <u>See</u> <u>Hellerstedt</u>, 136 S. Ct. at 2299, 2308-10 (discussing and applying the standard in <u>Casey</u>). While <u>Hellerstedt</u> does not expressly disavow <u>Salerno,</u> the Court's invocation of <u>Casey,</u> and the utter absence of any mention of the <u>Salerno</u> standard from that decision, counsels that the "undue burden" and "substantial fraction" analyses control in the instant case, not the "no set of circumstances" test from pre-<u>Casey</u> abortion jurisprudence.[26]

Accordingly, because defendants assert that plaintiffs fail to state a claim based on the <u>Salerno</u> "no set of circumstances" analysis, and all of defendant's arguments in favor of dismissal are premised upon an incorrect legal standard, the motion to dismiss is due to be denied.  In addition, under <u>Casey</u>, defendants are not entitled to a dismissal of plaintiffs'

---

[25]  In the decision reviewed by the Supreme Court in <u>Hellerstedt</u>, the Fifth Circuit observed that, "[i]n the abortion context, it is unclear whether a facial challenge requires showing that the law is invalid in all applications (the general test applied in other circumstances) or only in a large fraction of the cases in which the law is relevant (the test applied in <u>Casey</u>)." <u>Whole Woman's Health v. Cole</u>, 790 F.3d 563, 586 (5th Cir. 2015), *reversed and remanded,* <u>Hellerstedt</u>, 136 S.Ct 2292 (applying the <u>Casey</u> standard). The Supreme Court responded to the Fifth Circuit's perception of a lack of clarity concerning the applicable standard by evoking and applying <u>Casey</u>. After <u>Hellerstedt</u>, there is no longer anything "unclear" regarding <u>Casey</u>'s applicability "in the abortion context."

[26] Defendants' argument that the court "cannot invalidate a provision 'based on a worst case analysis that may never occur'" also misses the mark. (Doc. 31 at 48 (quoting <u>Ohio v. Akron Ctr. for Reproductive Health</u>, 497 U.S. 502, 514 (1990) ("Akron II"). In <u>Akron II</u>, which predates <u>Casey</u> by two years, the court applied the "no set of circumstances" standard to a facial challenge to an abortion statute. That standard is irreconcilable with the "large fraction" test, a fact which also casts doubt on the "worst case analysis" language on which defendants rely. In addition, the "worst case analysis that may never occur" in <u>Akron II</u> existed because the lower courts incorrectly interpreted the Ohio statute at issue as allowing an extension of bypass proceedings for up to 22 days by counting "calendar days" where the statute used the word "days." <u>Id.</u> at 513-14.  The Court found that the lower courts substituted language where a term was unambiguous. <u>Id.</u> No substitution of language or speculation is necessary to assess the constitutionality of the Act before this court.

lawsuit under the relatively low threshold required for a plaintiff to survive a Rule 12(b)(6) motion to dismiss, for the reasons discussed below.

### i. Count I – Right to an effective, confidential, and expeditious judicial bypass

The first count of plaintiffs' complaint is by far the most expansive, as it offers three separate arguments – each with subparts – against the constitutionality of each of the nine statutory provisions at issue.  With respect to the instant motion, the question before the court is whether plaintiffs have sufficiently pled their complaint in conformity with Fed. R. Civ. P. 8 so as to compel defendants to file a responsive pleading in defense of the complaint. A cause of action fails on a motion to dismiss only if there is clearly no claim as a matter of law.  Such is not the case here.

The plain language of the Act allows for parties other than the minor petitioner and the court to join the judicial bypass proceedings. Those include the DA, who "shall" appear and represent the interests of the State of Alabama,[27] a GAL to represent the interests of the unborn child, and the petitioner's parent, parents or legal guardian. See Ala. Code § 26-21-4.  Those parties are vested with the power to subpoena witnesses.  Id.  They may also examine witnesses during the bypass proceeding and present other evidence.  Id.  The DA must examine the petitioner, and other parties are entitled to be represented by an attorney and likewise question the minor.  Id. In addition, those parties are granted the right to petition the court for extensions of time "subject to the time constraints of the petitioner

---

[27] As noted *supra*, the State's interests are codified; those interests are insuring that the minor's rights are protected and defending the State's policy of protecting unborn life.  See Ala. Code § 26-21-1.

related to her medical condition." Ala. Code § 26-21-4(k). The court may *sua sponte* continue the proceedings for the same period of time and is empowered to subpoena witnesses. All parties have the right to appeal from any final decision on the minor's petition. While the statute contains a provision charging the presiding judge with the task of ensuring the confidentiality of the proceedings, the statute itself imposes no limits on the parties' or the court's ability to investigate for the purpose of gathering witnesses and evidence on the ultimate issues of the bypass proceeding: whether the minor is mature enough to make the decision to have an abortion, and whether the abortion is in her best interests.  See Ala. Code § 26-21-4(f, i, g & k).

Plaintiffs' claims set forth in Count I regarding the constitutionality of the Act under Bellotti II are pled sufficiently to state a cause of action to allow this declaratory judgment and § 1983 action to proceed beyond the initial pleadings. There are questions of law as to whether the Act passes constitutional muster – i.e., whether Casey's large fraction test is satisfied – and defendants have not demonstrated that plaintiffs' claims in Count I are foreclosed as a matter of law.

### ii.  Count II – Minor petitioner's right to informational privacy

In Count II, plaintiffs assert that the Act violates a minor petitioner's "right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment … by permitting" disclosure of "deeply sensitive, private information about the minor to others, including to any potential witnesses." (Doc. 1 at 13).  In their brief in support of the motion for a preliminary injunction, plaintiffs clarify that their "informational privacy" claim is derived from the Supreme Court's decision in Whalen v. Roe, 429 U.S. 529 (1977), in

which the Court "referred broadly to a constitutional privacy interest in avoiding disclosure of personal matters." Nat'l Aeronautics & Space Admin. v. Nelson, 562 U.S. 134, 135 (2011) (internal marks and citation omitted).  (Doc. 3 at 38-43).  The Supreme Court has only twice squarely discussed that particular privacy interest since Whalen, in Nixon v. Administrator of General Services, 433 U.S. 425, 457, 97 S.Ct. 2777 (1977) and Nelson, *supra*. The Nelson decision notes that lower state and federal courts vary in their interpretations of Whalen; some employ a test balancing the individual's interests against the government's and, at the other end of the spectrum, one court expresses skepticism about the constitutionality of the "right" to informational privacy.  Nelson, 562 U.S. at 146 n. 9 (citing and discussing Barry v. New York, 712 F.2d 1554, 1559 (2d Cir. 1983)); J.P. v. DeSanti, 653 F.2d 1080, 1090 (6th Cir. 1981); Fraternal Order of Police v. Philadelphia, 812 F.2d 105, 110 (3d Cir. 1987); Woodland v. Houston, 940 F.2d 134, 138 (5th Cir. 1991) (*per curiam*); American Federation of Govt. Employees v. HUD, 118 F.3d 786, 791 (D.C. Cir. 1997) ("express[ing] 'grave doubts' about the existence of a constitutional right to informational privacy"); In re Crawford, 194 F.3d 954, 959 (9th Cir. 1999); State v. Russo, 259 Conn. 436, 459–464, 790 A.2d 1132, 1147–1150 (2002)).

Taking its cue from Nelson and its two predecessor decisions, this court declines to join the debate on the constitutionality of such a right in ruling on the instant motion to dismiss and, instead, assumes – as the parties do – that such a right to informational privacy exists and that it is of "constitutional significance." Nelson, 433 U.S. at 147. The defendants argue that the interest in informational privacy is two-fold: an individual interest in (1) "avoiding disclosure of personal matters" and (2) "making certain kinds of

important decisions free from government interference." <u>Nelson</u>, 433 U.S. at 145 (quoting and paraphrasing <u>Whalen</u>, 429 U.S. at 598-600) (internal marks omitted); <u>see also</u> Doc. 31 at 76-80.

As to the first interest, defendants attempt to cabin the plaintiffs' claim to those provisions of the Act that allow for witnesses to be called. That limitation is unfounded. Plaintiffs also argue that the Act's inclusion of the DA, a GAL, and the minor's parents in the proceedings touches upon the interest in "avoiding the disclosure of personal matters." (Doc. 37 at 74-75).  The point of a judicial bypass is for the minor to obtain an abortion lawfully without parental consent and to preserve her anonymity in the process.  The bypass proceeding must be confidential, and reasonable safeguards must protect the petitioner's anonymity. <u>Bellotti II</u>, 443 U.S. at 644. Defendants have not offered authority that persuades the court that plaintiffs are foreclosed as a matter of law from asserting that disclosure of information regarding the bypass proceeding to third parties violates the minor's interest in informational privacy.

### iii.  Counts III & IV – Out-of-state minors

As discussed *supra*, the parties substantively agree on the meaning of § 26-21-4(a) – i.e., that it "exempts out-of-state minors from the parental-consent requirement altogether." (Doc. 31 at 80; Doc. 38).  Because the parties do not differ in their reading of that section, which is the subject of Counts III and IV, the court asked the parties to discuss the potential for settlement of that question at the hearing on the instant motion, but the parties did not reach an agreement. (Doc. 46, 47). In light of both parties' positions in this lawsuit that § 26-21-4(a) permits a non-resident minor to have an abortion lawfully in

Alabama without either parental consent or judicial bypass, defendants' motion to dismiss is due to be denied with respect to plaintiffs' claims on this point.  (Doc. 1 at 13-14).

## V. Conclusion and Order

In this ruling, this court neither implies nor decides which party will prevail when these claims are presented to the court for final adjudication. The holding of this decision on defendants' motion to dismiss is simply that this court has subject matter jurisdiction over and will adjudicate this lawsuit, and that plaintiffs' claims are sufficiently pled to survive a motion to dismiss.

Accordingly, and for the reasons discussed, it is

ORDERED as follows:

1. Defendants' motion to dismiss (Doc. 30) is DENIED.

2. Defendants shall file their answer to plaintiffs' complaint on or before September 16, 2016.  Thereafter, the pleadings are closed.

3. The court DEFERS ruling on plaintiffs' motion for a preliminary injunction (Doc. 2) until after defendants' answer is filed.

4. The court construes plaintiffs' motion for a partial declaratory judgment and for entry of a permanent injunction (Doc. 46) as a Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings. Because the pleadings were not closed at the time that plaintiffs filed the motion, it is due to be and hereby is DENIED as premature, without prejudice to plaintiffs' right to reassert a timely motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(c).

5.  The stay of these proceedings shall remain in effect until further order of this

court, except to the extent that defendants are granted leave to file an answer in

accordance with this order.

DONE, on this the 2nd day of September, 2016.

/s/ Susan Russ Walker
Susan Russ Walker
Chief United States Magistrate Judge